FORET v. PAUL ZIBILICH CO., INC.

(November 3, 1931.  Opinion and Decree.)
(November 16, 1931.  Rehearing Refused.)

Titche, Kiam & Titche, of New Orleans,
attorneys for plaintiff, appellant.

James J. Landry, of New Orleans, attor-
ney for defendant, appellee.

WESTERFIELD, J.  This is an appeal
from a judgment dismissing a suit brought
under the Compensation Law of the state
(Act No. 20 of 1914, as amended).  The
facts, which are not in dispute, are as
follows:

Plaintiff, Albert Foret, was employed by
the defendant, Paul Zibilich Company, Inc.,

as an oyster shucker. On the 22d day of December, 1930, while so employed, a piece of oyster shell struck him in his right eye, causing the loss of sight in that eye and an impairment of vision in the other eye. He was paid compensation by the Home Accident Insurance Company of Little Rock, Ark., defendant's insurer, 'for six weeks in the sum of $9.75 a week. The payments stopped because the Home Accident Insurance Company became insolvent and, at the time of the trial of the suit, was in the hands of a receiver, whereupon this suit was brought and judgment asked against defendant on the basis of permanent total disability, claiming $9.75 per week for 300 weeks and $250 medical expenses, subject to a credit of six weeks.

The suit is defended upon the ground that defendant's business does not come within the enumeration of businesses declared to be hazardous under the Compensation Law, Act 20 of 1914. To this contention plaintiff replies that defendant, having paid full compensation to plaintiff for a period of six weeks, it is estopped from questioning his right to further compensation, citing Summers v. Woodward, Wight & Co., 142 La. 241, 76 So. 674, and particularly the following text which appears in the syllabus of that case:

"Where an employer pays the wages of an injured employee in full for a number of weeks, and subsequently in part, and, holding a policy of insurance, taken out with express reference to the Burke-Roberts Employers' Liability Act (Act No. 20 of 1914), obtains receipts showing such payments as for wages to which the employee was entitled under the Louisiana Workmen's Compensation Act, upon which it obtains reimbursement from the insurance company, the question whether the injury of the employee entitles him to compensation under the act will be regarded as eliminated." See, also, Johnson v. Vernon Parish Lumber Co., 151 La. 664, 92 So. 219, and Norris v. La. Central Lumber Co., 7 La. App. 490.

Subsequent to the decisions in the cases relied on, however, we find the following amendment to have been incorporated in the Compensation Law by Act 85 of 1926, section 18, paragraph 5:

"Neither the furnishing of medical services nor payments by the employer or his insurance carrier shall constitute an admission of liability for compensation under this act."

The language quoted is very clear and entirely inconsistent with the estoppel based upon the previous payment of compensation, the fact relied on in this case in support of the plea.

The alternative position of counsel for plaintiff is that the occupation of defendant is comprehended by the express terms of the compensation statute. Reference is made to section 1, subsection 2, paragraph "a," which enumerates the various occupations to which the act shall apply as follows:

"The operation, construction, repair, removal, maintenance and demolition of railways, and railroads, vessels, boats * * * rendering works, slaughter houses, meat packing plants, ice plants. * * * Any occupation entailing the manufacture, transportation, care of, use of, or regular proximity to dangerous quantities of gun powder, dynamite, nitroglycerine and other like dangerous explosives. The installation, repair, erection, removal or operation of boilers, furnaces, engines and other forms of machinery."

The defendant company deals extensively in oysters, shrimp, crabs, frogs, and tur-

tles. In its literature it describes its business as a "banner oyster and fish depot" and as the largest and most reliable oyster and fish shippers in New Orleans. It employs, at times, as many as twelve men to open oysters, or, as it is called, to "shuck" them. The oysters, when opened, are packed in their own juices, in wax-covered cardboard containers and, in some instances, in tin cans. How its other products are marketed does not clearly appear, but there is no "processing" of any kind. The oysters and shrimp and crab meat, its principal products, are intended to be consumed within a short period, say, thirty-six hours, after they are sold. There is a small ice-cracking machine on the premises, which, according to the testimony, accommodates about 25 pounds of ice at a time, and also a small refrigerator operated by a motor or engine.

The question we are called upon to decide is whether defendant's business may be said to be a meat-packing plant within the meaning of the statute, which applies to "slaughter houses, meat packing plants, ice plants," or is it an occupation entailing "the installation, repair, erection, removal, or operation of boilers, furnaces, engines and other forms of machinery." We find an admission in the record, the effect of which would tend to prove that oyster shucking, the business in which plaintiff was engaged when injured, is in fact a hazardous occupation, and, from what we know of its character, we are convinced that it is in fact hazardous; but its hazardous character is not sufficient to bring it within the scope of the Compensation Law. It must come within the specified trades, businesses, and occupations mentioned in the act. Shipp v. Bordelon, 152 La. 795, 94 So. 399. Counsel argues that there is no distinction between the meat of warm-blooded animals, such as is commonly put up in the large packing houses in the country, and the meat of other animals, such as fish, turtle, crabs, etc., dealt in by the defendant, and that the question of the size of the operations cannot be considered; that the character of the business as meat packer being established, the kind and amount of the meat that is packed is immaterial. Perhaps no distinction in a degree should be made, and yet, in ascertaining the legislative intent, some consideration should be given to the common meaning of the words therein employed. There is in the record the testimony of a witness by the name of Hamilton K. Avery, described as an industrial and research engineer, with special knowledge of the meat-packing business. He testified after examining the defendant's plant, that it in no wise resembled a meat-packing plant, and could not be so classified, pointing out in detail certain distinctions.

It must be conceded that the packing of meat, whether it be the flesh of the cow, the hog, or the turtle, or the crab, and, whether it be in large or small quantities constitutes meat packing, using the word "packing" in the sense of its simplest application, as meaning to place in a container. But it seems equally clear to us that the Legislature had in mind a more complex operation, and that it employed the term "meat packing" in a larger sense, the one in which it is generally understood. In the oft-quoted case of Williams v. Schehl, 84 W. Va. 499, 100 S. E. 280, the Supreme Court of West Virginia, in considering a somewhat analogous situation,

held that the "business of a retail grocer who also butchers cattle, sheep and hogs at a slaughter house operated in another place, for sale to his retail customers, and who at his grocery store cuts the meat, makes sausage and renders lard from such animals, for sale in a small way, is not engaged in the business of operating a slaughter and packing house within the meaning of schedule 'n' of section 18 of the Workmen's Compensation Law of this state" (West Virginia), which included "slaughter and packing houses, stock yards, soap, tallow, lard and grease manufactories, tanneries, * * * in which power driven machinery is used."

And so it seems to us here that meat packing means a more extensive operation than that involved in defendant's business and includes some form of processing, heating, or treatment designed to preserve the product for an indefinite time.

The presence of the little gasoline engine on the premises is not, we believe, sufficient to bring defendant's business within the following language of the statute:

"Any occupation entailing the manufacture, transportation, care of, use of, or regular proximity to dangerous quantities of gun powder, dynamite, nitro-glycerine and other like dangerous explosives. The installation, repair, erection, removal or operation of boilers, furnaces, engines and other forms of machinery" (section 1, subsec. 2, par. a) particularly since the engine is shown to have been separated from plaintiff by a brick wall.

Our conclusion is that plaintiff cannot recover. Consequently, and for the reasons assigned the judgment appealed from is affirmed.